UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  16-cv-80074-BLOOM/Valle

AMERICAN CASUALTY COMPANY OF
READING, PENNSYLVANIA,

      Plaintiff,

v.

SAMUEL BELCHER, et al.,

      Defendants.

_____/

## ORDERS ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant/Counterclaimants Samuel and Ruth Belcher's (the "Belchers") Renewed Motion for Partial Summary Judgment, ECF No. [79] (the "Belcher Motion"), Defendants Catherine Hoecherl, Louise Constantine, Mary Katherine Worth, Helen Pluskot, Delphine Metcalf, and Patricia Curry's (collectively, the "Hoecherl Claimants") Motion for Final Summary Judgment, ECF No. [83] (the "Hoecherl Claimants' Motion"), and Plaintiff/Counter-Defendant American Casualty Company of Reading, Pennsylvania's ("Plaintiff" or "American Casualty") Motion for Summary Judgment, ECF No. [98] ("American Casualty's Motion").  The Court has carefully reviewed the Motions, the record, all supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised in the premises. For the reasons that follow, the Belcher Motion and the Hoecherl Claimants' Motion are denied, and American Casualty's Motion is granted.

## I.    BACKGROUND

American Casualty filed a Complaint for Declaratory Judgment seeking construction of two insurance contracts (the "Policies")—one with Eastern Pharmacy, Inc. ("Eastern Pharmacy")

and one with the pharmacist in charge of Eastern Pharmacy, James Kilbride ("Kilbride") (collectively, the "Insureds"), ECF No. [1]. American Casualty named as Defendants to this action twelve individuals (the "Claimants"), who had either brought state-court actions against the Insureds or made claims against the Policies.[1]  *Id.* at ¶¶ 4-14, 16.  The claims and the resulting state-court actions arose out of injuries caused by the repackaging of certain drugs that was performed at Eastern Pharmacy.  At all relevant times, the Insureds were covered by professional liability policies issued by American Casualty.  The issue relates to the determination of claim coverage under the facts of the case as applied to the language of the Policies.  In its Complaint, American Casualty "seeks a judgment declaring that the [Claimants' claims] arise from 'related acts, errors or omissions,' as defined in the Policies, and therefore constitute 'related claims,' as defined in the Policies."  *Id.* at ¶ 1.  In their separate Counterclaims, Defendants Samuel and Ruth Belcher seek a partial judgment finding that the Belcher claim is not "related" to any other claim.  Catherine Hoecherl and Helen Pluskot seek a judgment declaring that their claims presented against the Insureds constitute three (3) or more claims as "separate and distinct professional act[s]."  *See* ECF Nos. [16], [43], [44].

### A.  The Underlying Medical Incidents

Between October 2013 and January 2014, eleven (11) of the twelve (12) Claimants (collectively, the "Injured")[2] received intraocular injections of either the drug Lucentis or the drug Avastin[3] at Vitreo-Retinal Consultants of the Palm Beaches, P.A. ("VRC"), from which the

---

[1] The Insureds were not named as Defendants here; a settlement agreement between the parties and the Insureds provides a complete release and discharge of the Insureds.  *See* ECF No. [58-1] ("Agreement") at ¶ 2.  The agreement expressed that American Casualty would not name the Insureds as Defendants in this suit because "they expressly agree to be bound by the outcome of the [litigation]."  *Id.* at ¶ 5.  The settlement agreement is more fully addressed *infra*.

[2] Excluding Ruth Belcher.

[3] Both drugs are manufactured and distributed by Genentech, Inc. ("Genentech").  (American Casualty's Statement of Facts, "American Casualty's SOF") ECF No. [81] at ¶ 15.  Avastin, which is approved for

Injured alleged that they contracted bacterial infections.  *See* American Casualty's SOF at ¶¶ 35-38.  Those bacterial infections led to swelling of the injected eyes and also temporary, and sometimes permanent, blindness.  *See* ECF No. [63] at 2.  All of the injections received by the Injured were performed by Salomon Melgen, M.D. ("Dr. Melgen") of VRC.   *See* American Casualty's SOF at ¶¶ 35-38.

Prior to administering the injections, Dr. Melgen had ordered Avastin and Lucentis for delivery to Eastern Pharmacy.[4]  At Dr. Melgen's request, the two drugs were repackaged into smaller dose single-use syringes.  Hoecherl Claimants' SOF at ¶¶ 1, 11-12; American Casualty's SOF at ¶ 26.  In total, Eastern Pharmacy received five separate deliveries of Avastin from July 2013 to December 2013, and six separate deliveries of Lucentis from June 2013 to December 2013.  ECF No. [79] (Belchers' Statement of Facts, "Belchers' SOF") at ¶¶ 2-3.  Eastern Pharmacy repackaged Avastin and Lucentis solely for VRC.  American Casualty's SOF at ¶ 30.  Daoud Zayed ("Zayed"), the owner of Eastern Pharmacy, performed all of Eastern Pharmacy's repackaging of Avastin and Lucentis while under the supervision of  Kilbride, the pharmacist in charge at Eastern Pharmacy.  Belcher SOF ¶3.  Kilbride was not physically involved in the repackaging himself.  Hoecherl Claimants' SOF at ¶ 4; American Casualty's SOF at ¶ 31.

Single vials of Avastin, containing 4 ml of the drug, were repackaged into 60 to 70 syringes, with each syringe intended for injection into a single eye of a single patient.  Hoecherl

---

use as an intravenous cancer treatment drug and packaged in vials measuring 100mg or 400mg, is widely used "off label" to treat eye disorders, such as wet age-related macular degeneration ("AMD").  *Id.* at ¶¶ 16-17.  Such use requires repackaging of Avastin into commonly used 1.25mg/0.5mL single-use syringes. *Id.* at ¶ 17.  Lucentis is explicitly approved to treat AMD and is packaged in a single-use vial designed to provide an individual dose to a single eye.  *Id.* at ¶¶ 18, 19; *see also* ECF No. [82] (Hoecherl Claimants' SOF" at ¶ 7).  Neither Avastin nor Lucentis is manufactured with preservatives and both must be repackaged in a sterile environment to prevent bacterial contamination.  American Casualty's SOF at ¶ 23.
[4] Dr. Melgen ordered Avastin from a wholesaler, Besse Medical, and Lucentis from Genentech.  Hoecherl Claimants' SOF at ¶¶ 11-12.

Claimants' SOF at ¶ 13.  In repackaging Avastin, Zayed would open the manufacturer's vial and fill twenty (20) syringes.  *Id.* at ¶ 15.  Upon completion, Zayed would cap the vial, which remained open and exposed to the air while the syringes were being filled, and then place the twenty (20) syringes in a refrigerator located in a separate room.  *Id.*  Zayed would then re-gown, re-glove and re-mask and return to the repackaging room. *Id.*  Zayed would repeat this process until sixty (60) to seventy (70) syringes of Avastin were filled from the vial.  *Id.*  Thereafter, the syringes were removed from the refrigerator and placed in Ziploc bags, with each Ziploc bag containing four syringes and bearing a lot number and expiration date created by Zayed.  *Id.*  The Ziploc bags would then be placed into larger Ziploc bags, which would be prepared for refrigerated shipment to VRC.  *Id.*

Single vials of Lucentis, containing 0.2 ml of the drug, were repackaged into four syringes, with each syringe intended for a single eye of a single patient.  *Id.* at ¶ 14.  In repackaging Lucentis, Zayed would remove twenty (20) vials of Lucentis from the refrigerator and take them to the repackaging room.  *Id.* at ¶ 16.  From there, Zayed would remove the caps from all twenty (20) vials and fill eighty (80) syringes.  *Id.*  As the syringes were being filled, the vials would remain open and exposed to the air.  *Id.* at ¶¶ 16-17.  Upon completion, Zayed would place the syringes in the refrigerator.  *Id.* at ¶ 16.  Zayed would repeat this process, twenty (20) vials at a time, until one hundred (100) vials had been repackaged.  *Id.*

All of Zayed's repackaging activities were performed using non-sterile protective gear and equipment—namely, gloves, gown, hairnet, syringes, gauze, towels, and alcohol—and the repackaging itself was performed on top of a laminar flow hood that Zayed never turned on.  *Id.* at ¶ 18; American Casualty's SOF at ¶ 33.

4

Eastern Pharmacy delivered the repackaged Avastin and Lucentis to VRC from June 2013 to December 2013.  Hoecherl Claimants' SOF at ¶ 8.  Dr. Melgen injected Samuel Belcher's eyes with Avastin on October 1, 2013, and the remaining Injured with either Avastin or Lucentis on January 2, 2014.  American Casualty's SOF at ¶¶ 36-38.  With respect to the Injured who received injections on January 2, 2014, three (3) were injected with Avastin and seven (7) were injected with Lucentis.  *Id.* at ¶ 38.  The Avastin injections received by Samuel Belcher on October 1, 2013 were contaminated with bacteria, causing acute endophthalmitis (inflammation) in both eyes.  Hoecherl Claimants' SOF at ¶ 19.  The injections of Avastin and Lucentis received by the remaining Injured on January 2, 2014 were contaminated with bacteria, resulting in the Injured developing inflammation and/or infections in either one or both eyes shortly after they received the injections.[5]  *Id.* at ¶¶ 19, 31; *see also* American Casualty's SOF at ¶¶ 36-37.  Testing of fluids drawn from the eyes of Samuel Belcher and Alberto Araj shortly after their respective injections identified Viridans Streptococcus as the specific bacterial contaminant with which they were infected.  The testing on the remaining Injured failed to identify the specific bacterial contaminant that caused the infections.[6]  American Casualty's SOF at ¶ 43; Hoecherl Claimants' SOF at ¶ 37; *see also* ECF No. [81-21] (Deposition Testimony of Dr. Daniel E. Buffington) at 35 (stating that, with respect to five of the Hoecherl Claimants,

---

[5] Some of the Injured received injections in one eye, whereas others received injections in both eyes.  *See id.* at ¶ 38.

[6] The parties dispute the result of the testing performed on Patricia Curry—specifically, whether she was infected with Viridans Streptococcus, like Samuel Belcher and Alberto Araj, or Bacillus Species, a different bacterial contaminant.  *See* American Casualty's SOF at ¶ 43; ECF No. [109] (Hoecherl Claimants' Response to American Casualty's SOF, "Hoerchel Claimants' Response SOF") at ¶ 43; Hoecherl Claimants' SOF at ¶ 37; ECF No. [105] (American Casualty's Response to Hoerchel Claimants' SOF, "American Casualty's Response SOF") at ¶ 37.  The Court notes the conflicting evidence on this issue.  *Compare* ECF No. [81-21] (Deposition Testimony of Dr. Daniel E. Buffington) at 34 (Q. "And you testified with respect to Patricia Curry that the bacterial contaminant done from a post-injection vitreous tap was known, correct?" A. "That's correct. Bacillus species."), *with* ECF No. [81-15] (Patricia Curry's Answers to Interrogatories) at 7 ("The strain of bacteria which caused me to contract endophthalmitis is unknown.").

"[w]e're precluded from understanding or identifying or discerning a specific bacteria, but they were patients who got similar batches of adulterated product from Eastern Pharmacy. . . . but at this juncture we can't discern which specific bacteria for those other patients").

A number of other VRC patients also experienced complications following injections received on January 2, 2014.  *See* Hoecherl Claimants' SOF at ¶ 34.  In response to the adverse patient reactions of January 2, 2014, VRC eventually had all of its unused syringes of Avastin and Lucentis, which totaled forty-eight (48), tested.  *Id.* at ¶¶ 38-39.  The testing revealed that eighteen (18) of the unused syringes were contaminated with one or more of eight (8) separately identified bacteria or other contaminants.  *Id.* at ¶ 39.

In January and February of 2014, after reports of the complications experienced by VRC patients, the Florida Department of Business and Professional Regulation ("FDBPR") and the Food and Drug Administration ("FDA") conducted inspections of Eastern Pharmacy.  American Casualty's SOF at ¶ 44.  The FDBPR subsequently issued a Notice of Violation to Eastern Pharmacy that identified violations of several provisions of Florida law related to Eastern Pharmacy's repackaging activities, including, among other violations, Eastern Pharmacy's repackaging without the required permit and failure to have or implement proper procedures for the repackaging of sterile products.  *Id.* at ¶ 45.  The FDA, as a result of its inspection, issued Eastern Pharmacy a warning letter that identified deficiencies in Eastern Pharmacy's repackaging of Avastin and Lucentis, including Eastern Pharmacy's failure to use a functional laminar flow hood and failure to separate the sterile drug processing area from the common pharmacy area.  *Id.* at ¶ 46.

While there is a general consensus among the parties that "each syringe of Avastin and Lucentis repackaged by Eastern [Pharmacy] suffered from the same deficiencies in preparation,

documentation, and labeling that created an adulterated, non-sterile product," *see* American

Casualty's SOF at ¶ 41; ECF No. [81-21] (Deposition Testimony of Dr. Daniel E. Buffington) at

60-62 (Q. "In your review of the materials, is your opinion the same: That each vial, that

meaning every single vial of Avastin or Lucentis by Eastern Pharmacy for Dr. Melgen, does each

vial that was prepared fall within or have the same issues with respect to preparation and

dispensing that you just identified?" A. "*Each vial, but more importantly, each syringe*, because

them being – each syringe representing the individual finished dose. And the answer is, 'Yes.'")

(emphasis added), none of the parties are able to identify the specific act or omission, or series of

acts or omissions, committed by Zayed that led to the contamination of the syringes used on the

Injured at VRC, *id.* at ¶ 42; Hoecherl Claimants' SOF at ¶¶ 54, 57.

Three of the Injured filed state court claims against a variety of defendants, including the

Insureds, Dr. Melgen, and Genentech.[7]  ECF No. [1] at ¶¶ 42-44.  The remaining eight (8)

Injured did not file suit, but made demands against Eastern Pharmacy and Kilbride.  *See id.* at ¶¶

42-44.

### B.  The Policies

American Casualty issued Healthcare Providers Professional Liability Insurance Policy

No. HPG-059274223 to Eastern Pharmacy for the policy period from June 26, 2013 to June 26,

2014, ECF No. [1-14] (the "Eastern Pharmacy Policy"), and Healthcare Providers Professional

Liability Policy No. HPG-018449503-8 to Kilbride for the policy period from October 1, 2012 to

October 1, 2013, ECF No. [1-15], (the "Kilbride Policy").  Pertinent here are the Policies'

inclusion of a $1 million liability limit for "each claim" and a $3 million liability limit for "all

claims in the aggregate."  ECF No. [1-14] at 18; ECF No. [1-15] at 16.

Both Policies provide that American Casualty

---

[7] There is not a complete overlap of defendants in all three cases.

> will pay all amounts, up to the Professional Liability limit of liability stated on the **certificate of insurance**,[8] that **you**[9] become legally obligated to pay as a result of a **professional liability claim** arising out of a **medical incident** by **you** or by someone for whose **professional services you** are legally responsible.

ECF No. [1-14] at 11; ECF No. [1-15] at 9.  The Policies define "**medical incident**," in relevant part, as "any act, error or omission in your providing **professional services** which results in **injury** or **damage**."  ECF No. [1-14] at 14; ECF No. [1-15] at 12.  With respect to multiple claims made against the Insureds, the Policies provide:

> The limits of liability shown on the **certificate of insurance** is the maximum amount we will pay regardless of the number of **you** insured under this Coverage Part, **claims** made or persons or entities making **claims**.
> . . . .
> If **related claims** are made against **you**, all such **related claims** shall be considered a single **claim**, and the limits of liability applicable to such claim shall be the limits of liability applicable to the policy period in force when the act, error or omission, or earliest of **related acts, errors or omissions**, occurred.

ECF No. [1-14] at 18; ECF No. [1-15] at 16.  The Policies define "**related claims**" as "all **claims** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services** or placement services."  ECF No. [1-14] at 14; ECF No. [1-15] at 12.  In turn, the term "**related acts, errors or omissions**" is defined as "all acts, errors or omissions in the rendering of **professional services** or placement services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision."  ECF No. [1-14] at 14; ECF No. [1-15] at 12.

The Policies' liability limits are the subject of the settlement agreement entered into by the parties and the Insureds, *see supra* note 1, which "provide[s] a complete release to the Insureds and all other insureds under the Eastern [Pharmacy] and Kilbride Policies and to American Casualty in exchange for payments and agreements . . . by American Casualty."

---

[8] All bolded words refer to terms that are defined by the Policies.
[9] Referring to either Eastern Pharmacy or Kilbride, depending on the policy.

Agreement at 2.  Under the agreement, American Casualty agrees to pay to the Claimants the sum of $1,740,000.00 (the "Guaranteed Payment") and to maintain and have available $130,000.00 from both Policies to "resolve potential future claims against any person or entity insured under [those policies] for injuries allegedly resulting from ocular injections of purportedly contaminated Avastin or Lucentis allegedly compounded by or on behalf of [Eastern Pharmacy or Kilbride]."  *Id.* at 2, 4-5.  The agreement further provides that Samuel and Ruth Belcher, Catherine Hoecherl, and Louise Constantine would dismiss with prejudice their respective state-court lawsuits against Eastern Pharmacy within five days of payment by American Casualty.  *Id.* at 5-6.  The agreement contemplates the instant action, providing that within thirty days of the agreement's effective date, American Casualty would file a declaratory judgment action (the "Coverage Litigation") in this district, limited to the issue of whether the claims and lawsuits shall be deemed one or more claims under the Policies.  *Id.* at 6.  More specifically, the agreement provides that if the Court finds at the conclusion of the Coverage Litigation that the Claimants' claims constitute "related claims" as defined in the Policies— therefore rendering them subject to the per claim limit of $1 million under each policy— American Casualty will not have any obligation under the agreement to make any payment to the Claimants beyond the Guaranteed Payment.  If, however, the Court determines that the Claimants' claims constitute two claims under each of the Policies, American Casualty will pay an additional sum of $1 million per policy beyond the Guaranteed Payment.  And if the Court determines that the Claimants' claims constitute three or more claims under each of the Policies, American Casualty will pay an additional sum of $1.5 million per policy beyond the Guaranteed Payment.  *See id.* at 6-8.

### C.  The Parties' Respective Interpretations

Case No. 16-cv-80074-BLOOM/Valle

American Casualty essentially argues that, under the "clear and unambiguous" language of the Policies, all of the Claimants' claims are related because each arise from Eastern Pharmacy and Kilbride's "alleged continued, systemic failure to implement or adhere to an aseptic process necessary to prevent contamination in repackaging Avastin or Lucentis for the same doctor to be used to treat the same medical condition over a three-month period." American Casualty's Motion at 9, 12. The Belchers, in contrast, argue that "there is a minimum of two separate, unrelated claims[,]" contending that Samuel Belcher's injuries stem from an "isolated event" thereby precluding a logical or casual connection to any of the remaining Claimants' claims. Belcher Motion at 7-8, 14; *see also* ECF No. [103] (Aruj, Austin, Randolph and Carter's Response in Opposition to Plaintiff's Motion for Summary Judgment, "Aruj Claimants' Response") at 1 (adopting by reference the Belcher Response in Opposition to Plaintiff's Motion for Summary Judgment). The Hoecherl Claimants argue that "there are no fewer than three sub-groups of claims that are not related": (1) the Belchers' claim, stemming from injections of Avastin administered to Samuel Belcher on October 1, 2013; (2) the claims of three (3) of the Claimants who were injected with Avastin on January 2, 2014; and (3) the claims of seven (7) of the Claimants who were injected with Lucentis on January 2, 2014. Hoecherl Claimants' Motion at 2 n.2.

## II.  LEGAL STANDARD

A district court's disposition of cross-motions for summary judgment employs the same legal standards applied when only one party files a motion. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.") (quoting *Bricklayers*

*Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).[10]   A court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration."   *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).   "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts."   *Id.* (citing *Oakley*, 744 F.2d at 1555-56); *see also Bricklayers*, 512 F.2d at 1023.

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations.   *See* Fed. R. Civ. P. 56(c).   An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).   A fact is material if it "might affect the outcome of the suit under the governing law."   *Id.* (quoting *Anderson*, 477 U.S. at 247-48).   The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor.   *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).   "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.   The Court does not weigh conflicting evidence.   *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130,

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the court adopted as binding precedent all decisions of the Fifth Circuit issued prior to October 1, 1981.

1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed. Appx. 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor.  *Shiver*, 549 F.3d at 1343.  But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed.  *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).  Critically, there remain no disputed issues of material fact that would preclude the Court's entry of judgment as a matter of law.

## III.  DISCUSSION

The parties agree that Florida law governs the interpretation of the Policies.  "Under Florida law an insurance policy is treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy.  As with all contracts, the

interpretation of an insurance contract is a question of law to be determined by the court." *Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 666 F. Supp. 2d 1332, 1336 (S.D. Fla. 2009) (quoting *Fabricant v. Kemper Independence Ins. Co.*, 474 F. Supp. 2d 1328, 1330 (S.D. Fla. 2007)), *aff'd*, 374 F. App'x 906 (11th Cir. 2010); *see also Camico Mut. Ins. Co. v. Rogozinski*, 2012 WL 4052090, at *6 (M.D. Fla. Sept. 13, 2012) ("Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law.") (quoting *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001)); *Direct Gen. Ins. Co. v. Indian Harbor Ins. Co.*, 2016 WL 5437062, at *3 n.4 (11th Cir. 2016) ("[T]he question of whether certain claims are related is a matter of contract interpretation and thus a legal issue.").   Florida law requires that "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect."  *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007).   Additionally, "Florida courts have said again and again that insurance contracts must be construed in accordance with the plain language of the policy."  *Vozzcom*, 666 F. Supp. 2d at 1336 (quoting *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 735 (Fla. 2002)). Indeed, "[i]n construing terms appearing in insurance policies, Florida courts commonly adopt the plain meaning of words contained in legal and non-legal dictionaries."  *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1263 (11th Cir.2000) (per curiam).   Here, the relevant portions of the Policies provide:

> "**Related Claim**" means all **claims** arising out of a single act, error or omission or arising out of **related acts, errors or omissions** in the rendering of **professional services** or placement services.

> "**Related acts, errors or omissions**" mean all acts, errors or omissions in the rendering of professional services or placement services that are logically or

> causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

ECF No. [1-14] at 14; ECF No. [1-15] at 12.

American Casualty contends that, as a matter of law, the Policies' definitions for the terms "related claim" and "related acts, errors or omissions" are clear and unambiguous. American Casualty's Motion at 9-12.  The Hoercherl Claimants argue that because the above mentioned provisions are used as an exclusion or limitation to coverage, their interpretation and application "must be conducted liberally in favor the insureds and strictly against [American Casualty]."  Hoecherl Claimants' Motion at 6.  The Court agrees with American Casualty and finds no occasion to construe the Policies either for or against a particular party.

"Under Florida law, *when a term in an insurance policy is ambiguous*, the court must construe it in favor of the insured and against the insurer."  *Wendt*, 205 F.3d at 1261–62 (citing *Gas Kwick, Inc. v. United Pacific Insurance Co.*, 58 F.3d 1536, 1539 (11th Cir.1995)) (emphasis added).  Here, none of the Claimants argue that any provision in the Policies is ambiguous or unclear, *cf. id.* at 1262 (addressing defendants' arguments that the term "related wrongful acts" was susceptible to two or more meanings and was therefore ambiguous), and the Court sees no basis to find any ambiguity or susceptibility to multiple meanings in either of the terms "related claim" or "related acts, errors, or omissions" under the Policies, *see generally Gas Kwick*, 58 F.3d at 1539 ("An insurance contract is deemed ambiguous if it is susceptible to two or more reasonable interpretations that can fairly be made.") (citing *Dahl-Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379 (11th Cir.1993)).  Significant to the Court's analysis is the fact that the terms are expressly defined by the Policies.[11]  Furthermore, with respect to the Policies'

---

[11] Those express definitions distinguish this case from many of the cases cited by the Hoecherl Claimants in their motion for summary judgment.  *See, e.g., Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*, 84 A.3d 1167, 1177 (Ct. 2012) ("[I]t is far from clear from the policy's use of the term 'related,' *with no*

definition for "related acts, errors or omissions"—which the Policies' definition for "related claim" necessarily depends on—the express requirement of a "logical[] or causal[] connect[ion]" renders the definition clear and unambiguous.[12]  *See, e.g.*, *Rogozinski*, 2012 WL 4052090, at *6, *11 (finding that an accountant's professional liability insurance policy defining the term "Multiple Acts, Errors or Omissions" as "all acts, errors or omissions in rendering Professional Services that are *logically or causally connected* by any common fact(s), circumstances, situation, transaction(s), event(s), advice or decisions" was "clear and unambiguous") (emphasis added); *Vozzcom,* 666 F. Supp. 2d at 1334, 1339 (finding that an employment practices liability policy defining the term "Related Wrongful Acts" as "Wrongful Acts which are *logically or causally connected* by reason of any common fact, circumstance, situation, transaction, casualty, event or decision" lacked ambiguity) (emphasis added); *see also Wendt*, 205 F.3d at 1262 ("The words 'relate' or 'related' are commonly understood terms in everyday usage.  They are defined in the dictionary as meaning 'a logical or casual connection' between two events.") (citing

---

*more specific definition of that term provided*, that the parties intended multiple losses suffered by multiple people . . . to be aggregated into a single loss . . . simply because they shared a common, precipitating factor.") (emphasis added); *Arizona Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 456-57 (Ariz. 1987) (holding that the term "related" as used in the definition of "occurrence" in a malpractice policy was limited to causal connections (therefore excluding logical connections) where "[n]either the [] policy, the parties, nor the court of appeals have defined the word 'related'"); *Doe v. Illinois State Med. Inter-Ins. Exch.*, 599 N.E.2d 983, 988 (Ill. App. Ct. 1992) (finding "related acts" provision ambiguous because, in part, "the term 'related' is not defined in the policies and has no generally accepted legal meaning"); *Medical Malpractice Joint Underwriting Ass'n of R.I. v. Lyons*, 2004 WL 3190049, *6-7 (R.I. Super. December 17, 2004) ("The undefined phrase, 'all related acts' renders the limiting term 'medical incident' ambiguous at best.").

[12] The Claimants dedicate much of their focus on the purported lack of relatedness amongst the Claimants' *claims* on a general level.  *See, e.g.*, Hoecherl Claimants' Motion at 20 ("It is the moving Claimants' collective position that each of their *claims*, and each of the *claims* of the other  five claimants, represent a separate and distinct *claim* for a total of eleven *claims* against Eastern Pharmacy and eleven *claims* against Kilbride under the [] [P]olicies.") (emphasis added).  As the express language of the Policies make clear, however, a determination as to the relatedness of the Claimants' claims turns exclusively on the relatedness of the *acts, errors or omissions* at issue.  *See* ECF No. [1-14] at 14; ECF No. [1-15] at 12.  Here, there is no dispute that the specific acts, errors or omissions at issue are those related to Zayed's repackaging of the syringes administered to the Claimants.  *See, e.g.*, Hoecherl Claimants' Motion at 19 ("The *creation of each syringe* is a separate and discrete professional act . . . .") (emphasis added).

15

Webster's Third New International Dictionary (1981)).  Given the lack of ambiguity, the plain meaning of the terms control irrespective of their exclusionary or limiting effect on the Policies' coverage.  *See Vozzcom,* 666 F. Supp. 2d at 1339 ("[W]hile it is true that ambiguous insurance policy provisions must be construed in favor of the insured, there is simply no ambiguity in this case."); *Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 628 F. App'x 648, 653 (11th Cir. 2015) ("Exclusionary provisions that are clear and unambiguous must be enforced according to their terms, and 'courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties.'") (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla.2005)).

The applicable interpretive standards under Florida law having been identified, an analysis of three relevant cases—cited extensively in the parties' briefings—is instructive.  First, *Continental Casualty Company v. Wendt*, 205 F. 3d 1258 (11th Cir. 2000) is an Eleventh Circuit per curiam decision appending and adopting the district court's order.  In that case, investors of a corporation filed a class action lawsuit against an attorney alleging that the attorney gave inaccurate legal advice and made false and misleading statements regarding the legality of certain investments as securities.  *Id.* at 1260.  Another suit was soon brought against the broker of the investments, who in turn filed a third party complaint against the attorney alleging that the attorney made misrepresentations to him regarding the legality of such investments.  *Id.*  The lawsuits implicated the underlying professional liability insurance policy under which the attorney was insured.  *Id.*  The insurance policy stated in relevant part that "the limit of liability stated for 'each claim' is the maximum we will pay for all claims and claim expenses arising out of, or in connection with, the *same or related* wrongful acts."  *Id.* (emphasis added).  The insurance policy did not, however, define "related" as used in the term "related wrongful act."

*See id.* at 1260-61.  Consequently, the Eleventh Circuit affirmed the district court's broad definition of "related" as a "logical or causal connection between two events."  *Id.* at 1262.  In applying this definition, the court found that all of the attorney's various acts were related under the insurance policy.  *Id.* at 1263.  Those acts included, among other things, the attorney's: appearances at seminars where he held himself out as an attorney knowledgeable in securities law; representations at the seminars as to the legality of the investments; and taking loans of money from his employees, drafting brochures for use by promoters, and various other illegal and unethical activities all performed with the aim of supporting investment.  *Id.*  The court, in rejecting the argument that the attorney committed a series of disconnected acts with separate and distinct consequences to different individuals, emphasized that the language of the insurance policy "clearly focuses on the wrongful act or acts, and not on the number of duties breached or injuries sustained."  *Id.* at 1264.  More specifically, the Court reasoned that the attorney's "different types of acts" were "tied together because all were aimed at a single particular goal" in encouraging investment: "[T]hat these acts resulted in a number of different harms to different persons, who may have different types of causes of action against [the attorney] does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract. Rather they comprised a single course of conduct designed to promote investment . . . ."  *Id.*

Second, *Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 666 F. Supp. 2d 1332, 1339 (S.D. Fla. 2009), is a decision from the Southern District of Florida that also addressed the term "related wrongful act" under an insurance policy.  The district court held that separate lawsuits filed by three separate employees against their employer for unpaid overtime compensation were related.  Central to the court's decision was the fact that all three employees were employed by the employer in the same positions during the same period and all three were denied overtime

coverage during the course of their employment.  *Id.*  The court noted that one plaintiff brought

suit over a year after the original plaintiffs filed and that each plaintiff complained of numerous

violations that occurred over a period of time, but nonetheless found that the claims were related.

*Id.* at 1331, 1335, 1339.  Recognizing the "extremely broad" nature of the language at issue

under the insurance policy, the court explained that analyzing the "relatedness" of claims under

such language "does not require exact factual overlap, or even identical legal causes of action,

but rather focuses simply on whether the claims are logically linked by a 'sufficient factual

nexus.'"  *Id.* at 1338 (quoting *Capital Growth Financial LLC v. Quanta Specialty Lines Ins. Co.*,

2008 WL 2949492, at *4 (S.D. Fla. July 30, 2008)).

Third, in *Camico Mutual Insurance Company v. Rogozinski*, 2012 WL 4052090, at *6

(M.D. Fla. Sept. 13, 2012), a court in the Middle District of Florida addressed a professional

liability insurance policy that used language nearly identical to that at issue here—namely, "acts,

errors or omissions in rendering Professional Services that are logically or casually connected by

any common fact(s), circumstances, situation, transaction(s), event(s), advice or decisions."  In

that case, an insured accounting firm repeatedly made the same error for several years in a row in

its preparation of tax returns of three brothers who ran a joint business together, leading to

multiple claims against the accounting firm brought by the three brothers and their spouses.  *Id.*

at 2-5.  Relying on *Wendt* and *Vozzcom*, the court held that all three claims were related for

purposes of the insurance policy, explaining as follows:

> [A]ll harm arising from [the accounting firm's] multiple breaches can be
> attributed to one fact: in 1989 [the accounting firm] did not employ the proper
> care to discover whether the Rogozinskis' royalty income should be classified as
> capital gains.  All injuries or acts that occurred after [the accounting firm's] initial
> mistreatment of the royalty income constitute a series of errors alike in kind and
> injury. Thus, [the accounting firm's] acts are logically and causally connected, i.e.
> the same accountant made the same error for several years in a row concerning a
> joint business of the three brothers, resulting in errors in each of their individual

tax returns. Under the language of the Policy, then, the Rogozinskis are subject to the per claim limit.

*Id.* at 8.  Further, like the court in *Vozzcom*, the court in *Rogozinski* recognized that the three brothers, "to whom [the accounting firm] each owed a duty of care, brought multiple causes of action that accrued over a period of time[,]" but nonetheless found that the claims were related under the "broad" language of the underlying policy.  *Id.* at 10-11.

> As these cases illustrate, and as has been explained,
>
> [A] common thread running here views "relatedness" as a concept encompassing both logical and causal connections, *Continental Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir.2000), an assessment which typically involves consideration of whether the acts in question are connected by time, place, opportunity, pattern, and perhaps most importantly, by method or modus operandi, *See e.g. Brown v. National Union Ins. Co. of Pittsburgh, Pa.* 2004 WL 292158 (D.Minn.2004). Hence, courts analyzing the "relatedness" of claims in situations involving similar policy language consider, among other factors, whether the parties are the same, whether the claims all arise from the same transactions, whether the "wrongful acts" are contemporaneous, and whether there is a common scheme or plan underlying the acts.

*Capital Growth*, 2008 WL 2949492, at *4.

In the instant dispute, the Claimants argue that none of their individual claims against American Casualty are related under the Policies given the many dissimilarities among them. The Hoecherl Claimants, for example, point to "the number of injuries, the different medications, the manner in which the medications were prepared, the duties owed to the Claimants by Eastern Pharmacy and Kilbride, the extended time frame during which the injuries occurred, and the different bacteria and contaminants involved . . . ."  Hoecherl Claimants' Motion at 1.  The Hoecherl Claimants also emphasize that American Casualty cannot prove that the Claimants' injuries arose from the same cause—i.e., that it is unknown "how each individual syringe used on each of the Claimants became contaminated on a syringe by syringe basis."  *Id.* at 5.  These arguments, however, "ignore[] [the] many similarities between the claims" as well as the fact

that the Policies also deem claims related when they share a logical—as opposed to causal—relationship vis-à-vis any common fact, circumstance, situation, transaction, event, advice or decision.  *Vozzcom*, 666 F. Supp. 2d at 1339.

At the outset, the Court acknowledges the dissimilarities amongst the Claimants' claims. Samuel Belcher's injections were administered on October 1, 2013, whereas the remaining Injured's injections were administered on January 2, 2014.  Hoecherl Claimants' SOF at ¶¶ 19, 21-30.  Four (4) of the Injured received injections of Avastin, whereas the other seven (7) Injured received injections of Lucentis.  American Casualty's SOF at ¶ 38.  The precise method of repackaging employed by Zayed differed with respect to both drugs, and the contaminated syringes used for the Injured's injections were not all repackaged on the same date.  *See* Hoecherl Claimants' SOF at ¶¶ 15-17; Belchers' SOF at ¶¶ 2-3.  These dissimilarities are not insignificant by any measure, and at first blush they suggest that the Claimants' claims are not related to one another.

Other dissimilarities identified by the Claimants, however, are of a more qualified nature. First, with respect to the separate duties owed to the Claimants by Eastern Pharmacy and Kilbride, the express language of the Policies provide that more than one claimant may make multiple claims and still be subject to the per claim limit.  Thus, any "argument that [the Claimants'] claims are separate because [the Claimants] are owed separate duties does not accord with the unambiguous [] language" under the Policies.[13]  *Rogozinski*, 2012 WL 4052090, at *7; *see also Wendt*, 205 F.3d at 1263 ("The language of the insurance policy clearly focuses on the wrongful act or acts, and not on the number of duties breached or injuries sustained."). Second, with respect to the purportedly different contaminants involved, the undisputed facts

---

[13] It is worth noting that because Kilbride, the pharmacist in charge of Eastern Pharmacy, was not physically involved in any way with the repackaging of Lucentis and Avastin, any breaches of duties owed by him were necessarily the same as to all Claimants.

establish that, of the eleven (11) Injured, testing on only two of them identified the specific bacterial contaminant responsible for the resulting infections, and that in both instances the bacteria was the same—Viridans Streptococcus.  *See* American Casualty's SOF at ¶ 43; Hoecherl Claimants' SOF at ¶ 37.  Though several additional bacterial contaminants were discovered as a result of testing done on other VRC patients, testing on the remaining Injured was unable to identify the specific bacterial contaminant that caused their infections.  American Casualty's SOF at ¶ 43; Hoecherl Claimants' SOF at ¶ 37.  The Court rejects the view that, for purposes of the instant litigation, the presence of additional bacterial contaminants in syringes used on VRC patients other than the Claimants is case dispositive.  Finally, as for the approximately six-month period during which the repackaging at Eastern Pharmacy took place, such a time period is simply not dispositive or otherwise suggestive that the claims are unrelated, as argued by the Claimants.  *See, e.g.*, *Wendt*, 205 F.3d 1258 (promotional activities spanning over a year held to be related).

The fact that there exist dissimilarities among the Claimants' claims does not yield only one answer to the precise inquiry before the Court, which instead must focus on the similarities and ask whether the claims are related under the Policies by way of a logical or causal connection "by *any* common fact, circumstance, situation, transaction, event, advice or decision."  ECF No. [1-14] at 14; ECF No. [1-15] at 12 (emphasis added).  Turning to the similarities among the Claimants' claims, and viewing them in light of the very broad nature of the language at issue, *see Rogozinski*, 2012 WL 4052090, at *10-11; *Vozzcom,* 666 F. Supp. 2d at 1338, the Court finds that the claims certainly share at least one common fact, circumstance, situation, transaction, event, piece of advice or decision.  The most obvious is that all of the syringes used for the Claimants' injections were repackaged by the same individual, Zayed, at

the same pharmacy, Eastern Pharmacy.  And while there were some differences in Zayed's specific repackaging processes with respect to Avastin and Lucentis, the parties are in agreement that the processes employed by Zayed for each drug remained consistent and that both processes took place in what amounted to a non-sterile environment.  *See, e.g.*, American Casualty's SOF at ¶ 41; *see also* ECF No. [81-21] (Deposition Testimony of Dr. Daniel E. Buffington) at 40-41 ("Some of these are absolutes. Like the laminar flow hood. . . . [T]hey didn't use appropriate air filtration. . . . If you want to go on to say that they used inappropriate nonsterile supplies in the process.  They never stated that they use the sterile supplies. . . .  [T]here's a multitude of steps that we employ to assure patient safety and a sterile finished product.  Based on their own testimonies, and supported by the [] reports from both the Board of Pharmacy and the FDA, they failed to employ those.").  With respect to his repackaging of both Avastin and Lucentis, Zayed wore non-sterile protective gear, failed to turn on the laminar flow hood on top of which he performed the repackaging, and failed to separate the repackaging area from the common, non-sterile area of the pharmacy.  *See* Hoecherl Claimants' SOF at ¶¶ 14, 18; American Casualty's SOF at ¶¶ 33, 46.  At the very least, then, the individual responsible for the contaminated syringes, the general processes used to repackage those syringes, and the precise location where the contaminations originated are common to all of the Claimants' claims.  The Hoecherl Claimants appear to admit as much.  *See* Hoecherl Claimants' Motion at 19 ("The fact that the procedure to compound a syringe of Avastin in October of 2013 might be similar to the procedure to repackage a syringe of Lucentis in December of 2013, is insufficient to establish relatedness. . . . The only connection involves the location where the contaminated syringes originated and who prepared them.").  Notwithstanding the Hoecherl Claimants' minimizing view to the contrary, however, the combination of these factors essentially served as the genesis

to each of the Claimants' injuries and that alone renders their uniform connection to all of the claims significant.  Furthermore, beyond repackaging, the injections themselves constituted treatment for the same medical condition—AMD—and the Claimants all received that treatment from the same doctor, Dr. Melgen.  Dr. Melgen, in turn, was the only medical provider for which Eastern Pharmacy repackaged Avastin and Lucentis.  It simply cannot be said that these circumstances, construed under the broad language of the Policies, present a case where "a logical connection [is] too tenuous reasonably to be called a relationship."  *Wendt*, 205 F.3d at 1263 (quoting *Gregory v. Home Ins. Company*, 876 F.2d 602, 605-06 (7th Cir.1989)).

The Hoecherl Claimants also assert the position that because American Casualty cannot "point to a specific cause that led to the contamination of all the syringes that injured the claimants, [it] cannot prove that the Claimants' claims are related . . . ."  Hoecherl Claimants' Motion at 5.  However, nowhere in the Policies is it *required* that related claims grow out of the same cause, and the Court declines to read into the Policies such a requirement.  Instead, the Policies also define "related acts, errors or omissions" as those acts, errors or omissions in the rendering of professional services that are "*logically* . . . connected by *any* common fact, circumstance, situation, transaction, event, advice or decision."  ECF No. [1-14] at 14; ECF No. [1-15] at 12 (emphasis added).  To require that claims must also share a causal connection in order to be considered related under the Policies would render this language ineffectual.

The Court's view is not swayed by the Hoecherl Claimants' reliance on *American Casualty Co. of Reading, Pa. v. Allen*, 2015 WL 5693598 (N.D. Ala. Sept. 29, 2015), a decision that involved both American Casualty and claimants who suffered blood stream infections as a result of exposure to bacteria from compounded medication administered at six different Alabama hospitals.  *Id.* at *2.  Though there is substantial factual overlap between *Allen* and this

23

case, the procedural postures are markedly different.  In *Allen*, the underlying litigation between the claimants and American Casualty's insured remain unresolved, and the court declined to make a determination as to whether the underlying state-court claims at issue were related under the operative insurance policy based "on the pleadings alone." *Id.* at *2-3, *6.  The court reasoned that the underlying policy "[d]id not require that all claims *allege* the same type of wrongdoing to be considered related[.]" *Id.* at *6 (emphasis in the original).  Rather, as the court instructed: "To decide this issue, the court must determine whether some or all of the state-court claims arise from the same proximate cause, which is a *fact determination*." *Id.* (emphasis added).  Here, the Court is afforded the benefit of a fully developed factual record and is not tasked with resolving the issues of liability, causation, and damages as a result of the parties' settlement agreement.

In any event, regardless of the settlement agreement, the court in *Allen* fashioned its proximate cause standard—whereby "claims may be related if the alleged injuries arise from the same cause"—upon a review of Alabama case law dealing with "occurrence" based insurance policies. *See id.* at *5 (quoting *St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc.*, 893 So. 2d 1124, 1137 (Ala. 2004)); *see also St. Paul Fire*, 893 So. 2d at 1137 ("In *United States Fire Insurance Co. v. Safeco Insurance Co.*, 444 So. 2d 844 (Ala. 1983), the Alabama Supreme Court addressed the meaning of the term 'occurrence' for purposes of determining the deductible due from the insured. In that case, the Court concluded that *a single occurrence encompassed all the damage proximately resulting from each incident*.) (emphasis in the original).  Here, the Court is not considering whether "more than one accident or occurrence has taken place." *Allen*, 2015 WL 5693598, at *5 (quoting *United States Fire*, 444 So. 2d at 847).  Rather, the Court must determine under Florida law whether claims based on separate acts can be considered related

under the Policies, and under Florida law, "the language of the policy is the most important factor in interpreting insurance contracts." *Bond Safeguard,* 628 Fed. Appx. at 654 (quoting *Taurus Holdings*, 913 So. 2d at 537).  As such, because the language of the Policies recognize related claims that share a logical relationship as well as a causal relationship, the Court declines to adopt the *Allen* court's rigid proximate cause standard.  The departure from *Allen* is further justified by the Policies' definition of "related claim" as "all claims *arising out of* a single act, error or omission or *arising out of* related acts, errors or omissions in the rendering of professional services or placement services."   ECF No. [1-14] at 14; ECF No. [1-15] at 12 (emphasis added).  In addressing the meaning of the phrase "arising out of," the Eleventh Circuit has explained:

> [T]he Florida Supreme Court has provided some guidance on the meaning of "arising out of" in the context of insurance policy exclusions. In *Taurus Holdings*, the Florida Supreme Court held that the term "arising out of" is unambiguous and "broader in meaning than the term 'caused by.' " *Id.* at 539. Accordingly, the term should be interpreted broadly to encompass all of the following: "originating from, having its origin in, growing out of, flowing from, incident to, *or having a connection with*." *Id.* (emphasis added) (internal quotation marks omitted). The Florida Supreme Court explained that while "arising out of" requires "some causal connection, or relationship" that is "more than a mere coincidence," proximate cause is not required. *Id.* at 539-40 (internal quotation marks omitted).

*Bond Safeguard*, 628 Fed. Appx. at 654.

The Court next addresses the argument raised by the Claimants that their claims cannot be related because "there was no 'common scheme or plan' to prepare or distribute contaminated drugs."   Belcher Motion at 13; *see also* ECF No. [102] (Belcher Response in Opposition to Plaintiff's Motion for Summary Judgment, "Belcher Response") at 10; Aruj Claimants' Response at 1 (adopting by reference the Belcher Response); Hoecherl Claimants' Motion at 19. The Court disagrees.  Although the Insureds certainly did not endeavor to provide VRC with contaminated syringes, they did, presumably, endeavor to do just the opposite—that is, provide

Case No.  16-cv-80074-BLOOM/Valle

VRC with sterile, non-contaminated syringes exactly as ordered, as demonstrated by the consistent manner in which Zayed repackaged Avastin and Lucentis from vial to syringe.  Under these circumstances, that endeavor resembles a "single particular goal," and the Insureds' (as well as Zayed's) consistent and uniform efforts in pursuit of it, deficient as they proved to be, comprised a "single course of conduct."  *Wendt*, 205 F.3d at 1264.  Put simply, the acts in question here are connected by "pattern, and perhaps most importantly, by method or modus operandi[.]"  *Capital Growth*, 2008 WL 2949492, at *4.  That those acts constituted parts of a single pattern or single course of conduct is evinced by the FDBPR and FDA's respective inspections of Eastern Pharmacy, following the reports of complications experienced by VRC patients.  The scope of both inspections concerned Eastern Pharmacy's repackaging activities—primarily with respect to Avastin and Lucentis—from June 2013 to December 2013.  *See* ECF Nos. [52-1], [52-3].[14]  And although Eastern Pharmacy and Kilbride lacked ill will or malice—which is essentially what the Claimants' argument is based on—that does not render the pattern of conduct exhibited by them any less significant in terms of relatedness to the Claimants' claims. Similarly, the accounting firm in *Rogozinski* did not formulate a scheme or plan to make the same mistake on the Rogozinski brothers' tax returns year after year.[15]  *See* 2012 WL 4052090, at *8.

---

[14]  The Court notes that the Hoecherl Claimants challenge the findings and observations of both inspections on the grounds that American Casualty never deposed any inspector or representative of either agency.  *See* Hoecherl Claimants' Response SOF at ¶¶ 44-46.  For purposes here, the Court merely considers that the agencies did indeed conduct inspections of Eastern Pharmacy and that those inspections covered what they purported to cover—points the Hoecherl Claimants do not appear to take issue with.  *See id.*  It is further worth noting that the Hoecherl Claimants nevertheless rely on the findings and observations of FDBPR's inspection for its own factual assertion that Eastern Pharmacy repackaged other drugs besides Avastin and Lucentis.  *See id.* at ¶ 45.

[15]  The Belchers, as well as Defendants Alberto Aruj, Thomas Austin, George Randolph, and Raymond Carter, invoke the "rule of restrictive reading of broad language," *see generally Wendt*, 205 F.3d at 1263, but do so only to "compel[] the 'reasonable interpretation' there was never a common scheme or plan by Eastern Pharmacy to prepare or distribute contaminated drugs[,]"  Belcher Motion at 14; Aruj Claimants'

The Claimants' claims share much in common, rendering them "related" for purposes of the Policies.  The Claimants, to their great misfortune, sought out similar medical treatment for the same medical condition, and the two drugs used for that treatment were negligently repackaged by the same individual at the same pharmacy for the same doctor over a relatively short period of time.  Though true that the individual acts of repackaging constituted separate acts, these acts were nevertheless tied together by a sufficient nexus.  That nexus was Eastern Pharmacy—in particular, Zayed's woefully deficient repackaging process and Kilbride's utter lack of supervision over the same—and the single course of conduct Eastern Pharmacy employed in repackaging Avastin and Lucentis for VRC.  The fact that those errors and course of conduct may have exposed the Claimants to different bacterial contaminants and brought about different resulting injuries does not render the underlying "acts, errors or omissions" unrelated for purposes of the Polices.  *See Wendt*, 205 F.3d at 1264 ("The fact that these acts resulted in number of different types of causes of action against [the attorney] does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract.  Rather, they comprised a single course of conduct designed to promote investment . . . ."); *Rogozinski*, 2012 WL 4052090, at *8 ("[A]ll harm arising from [the accounting firm's] multiple breaches can be attributed to one fact . . . . [and] [a]ll injuries or acts that occurred after [the accounting firm's] initial mistreatment of the royalty income constitute a series of errors alike in kind and injury."). The Hoecherl Claimants overstate the issue in arguing that this interpretation of "related claims" under the Policies as applied to the facts of this case renders the Policies' aggregate coverage illusory.  *See* ECF No. [107] (Hoecherl Claimants' Response in Opposition to Plaintiff's Motion for Summary Judgment, "Hoecherl Claimants' Response") at 9.  While the "related claims"

---

Response at 5-6 ("Aruj, Austin, Randolph and Carter join Belcher and invoke this 'rule of restrictive reading.'").

language of the Policies is "extremely broad, [] it is also equally clear and without ambiguity." *Vozzcom*, 666 F. Supp. 2d at 1340. The Policies' language as applied to the facts of this case necessarily requires a finding that the Claimants' claims are related. To find otherwise would require the Court to rewrite the express provisions of the Policies.

Accordingly, the Court's application of the undisputed facts of this case to the language of the Policies dictates a finding that Eastern Pharmacy's negligent repackaging as to each of the single-use syringes of Avastin and Lucentis administered to the Claimants by VRC was "logically" connected by a "common fact, circumstance, situation, transaction, event, advice or decision." The Claimants' claims are, therefore, subject to the per claim limit under each of the Policies.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. American Casualty's Motion for Summary Judgment, **ECF No. [98]**, is **GRANTED**. The claims asserted against Eastern Pharmacy and Kilbride by Defendants Samuel and Ruth Belcher, Catherine Hoecherl, Louise Constantine, Mary Katherine Worth, Helen Pluskot, Delphine Metcalf, Patricia Curry, Alberto Aruj, Thomas Austin, George Randolph, and Raymond Carter constitute "related claims" under both the Eastern Pharmacy Policy and the Kilbride Policy, and are therefore subject to the per claim limit of $1 million under each.

2. Samuel and Ruth Belcher's Renewed Motion for Partial Summary Judgment, **ECF No. [79]**, is **DENIED**.

3.   Defendants Catherine Hoecherl, Louise Constantine, Mary Katherine Worth, Helen Pluskot, Delphine Metcalf, and Patricia Curry's Motion for Final Summary Judgment, **ECF No. [83]**, is **DENIED**.

4.   The Clerk shall **administratively CLOSE this case**.  All remaining pending motions are **DENIED as moot** and all deadlines and hearings are **TERMINATED**.

**DONE and ORDERED** in Miami, Florida, this 26th day of January, 2017.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record